| |
|---|
| **Douglas v Galea** |
| 2024 NY Slip Op 33636(U) |
| October 8, 2024 |
| Supreme Court, Kings County |
| Docket Number: Index No. 510076/20 |
| Judge: Genine D. Edwards |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

At an IAS Term, Part 80 of the Supreme
Court of the State of New York, held in and
for the County of Kings, at the Courthouse, at
Civic Center, Brooklyn, New York, on the 8th
day of October 2024.

PRESENT:

HON. GENINE D. EDWARDS,

Justice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JABEZ DOUGLAS, as Administrator of the Estate of
GAILINE BAPTISTE,

Plaintiff,

- against -

CHRISTINA GALEA,
PAUL EPSTEIN,
AVA BOOKER,
NORTHWELL HEALTH NORTH SHORE HOSPITAL, and
NORTH AMERICAN PARTNERS IN ANESTHESIA, LLP,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x[1]

**AMENDED
DECISION, ORDER, AND JUDGMENT**

Index No. 510076/20

Mot. Seq. Nos. 6 and 8

The following e-filed papers read herein:

NYSCEF Doc Nos.:

| | |
|---|---|
| Notice of Motion/Cross Motion, Affirmations, and Exhibits . . . . . . . . . . . . | 117-125, 128; 165-167 |
| Affirmations in Opposition and Exhibits. . . . . . . . . . . . . . . . . . . . . . . . . | 151-164 |
| Reply Affirmation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 173[2] |

In this action to recover damages for medical malpractice, lack of informed consent, and

wrongful death arising out of a massive and debilitating stroke, defendants Cristina Galea,

M.D. (incorrectly sued herein as Christina Galea) ("Dr. Galea"), Paul Epstein, M.D.

---

[1] The caption reflects the prior dismissals of defendant Martin Benjamin by order, dated April 5, 2024, and defendants Randall S. Feingold and Theresa Scolero by order, dated May 17, 2024, in resolution of Mot. Seq. Nos. 7 and 9, respectively.

[2] The Court did not consider the Supplemental Affirmation of Defense Expert Sudipta (Sid) Roychowdhury, M.D., dated April 24, 2024 ("Dr. Roychowdhury's supplemental affirmation"), which was annexed as an exhibit to defendants' Reply Affirmation and Opposition to Cross Motion, dated April 29, 2024 ("defendants' reply affirmation"). Dr. Roychowdhury's supplemental affirmation raised the new argument and evidence for the first time by defendants in reply. *See Alvarellos v. Tassinari*, 222 A.D.3d 815, 201 N.Y.S.3d 489 (2d Dept. 2023); *Pena v. Geisinger Community Med. Ctr.*, 209 A.D.3d 663, 174 N.Y.S.3d 873 (2d Dept. 2022). Likewise, the Court did not consider all references to (and quotes from) Dr. Roychowdhury's supplemental affirmation in defendants' reply affirmation. Further, in light of the Court's refusal to consider Dr. Roychowdhury's supplemental affirmation, the Court likewise declined to consider, for lack of good cause, the subsequently filed: (1) plaintiff's Attorney's Sur-Reply Affirmation, dated May 2, 2024; (2) plaintiff's supplemental Physician's Affirmation (neurology), dated May 2, 2024; (3) defense counsel's letter to the Court, dated May 3, 2024; and (4) plaintiff's counsel's response letter to the Court, also dated May 3, 2024. *See* CPLR 2214; *Attallah v. New York Coll. of Osteopathic Med.*, 189 A.D.3d 1324, 134 N.Y.S.3d 793 (2d Dept. 2020); *Lehman Bros. Bank v. Hickson*, 186 A.D.3d 1348, 129 N.Y.S.3d 2 (2d Dept. 2020).

[* 1]

2

(incorrectly sued herein as Paul Epstein) ("Dr. Epstein"), Ava Booker, CRNA (incorrectly sued herein as Ava Booker) ("Nurse Booker"), and North American Partners in Anesthesia, LLP ("NAPA" and collectively with Dr. Galea, Dr. Epstein, and Nurse Booker, "defendants"), jointly moved for summary judgment dismissing all claims of plaintiff Jabez Douglas, as the administrator of the Estate of his late mother, Gailine Baptiste ("plaintiff"), as against them. Plaintiff cross-moved for leave to serve his proposed Supplemental Verified Bill of Particulars, dated March 20, 2024 (the "supplemental BOP").

Plaintiff, in his opposition to defendants' motion, did not object (either explicitly or implicitly) to the dismissal of Dr. Epstein from this action. Nor did plaintiff object to (and thus effectively abandoned) his informed consent claim as against remaining moving defendants Dr. Galea, Nurse Booker, and NAPA. *See Clarke v. New York City Health & Hosps.*, 210 A.D.3d 631, 177 N.Y.S.3d 681 (2d Dept. 2022); *114 Woodbury Realty, LLC v. 10 Bethpage Rd., LLC*, 178 A.D.3d 757, 114 N.Y.S.3d 100 (2d Dept. 2019). The remainder of this Decision, Order, and Judgment addresses plaintiff's direct claims sounding in medical malpractice and wrongful death against Dr. Galea and Nurse Booker, as well as his vicarious liability claim against their employer, NAPA.

## Background

On Friday afternoon, January 11, 2019, plaintiff's decedent Gailine Baptiste (the "patient"), age 42, underwent an elective, one-hour-long[3] ambulatory surgery for post-bilateral mastectomy left-breast revision and right-breast reconstruction[4] with autologous fat grafting[5]

---

[3] The ambulatory surgery lasted 62 minutes. *See* NSUH Ambulatory Center, Nursing Intraop Record (part of Northwell Hospital's records). When quoting from the medical records, the Court spelled out all abbreviations, corrected typographical errors, and omitted unnecessary capitalization. All timed events were converted to military time for consistency.

[4] "Chart Copy Report" at NSUH-ASC 020.

[5] Operative Report, dated January 11, 2019, pages 1-2 (part of Northwell Hospital's records). The "autologous fat grafting" procedure was described in the Operative Report, as follows:

"[A] 3-mm and 4-mm Mercedes *cannula liposuction* was performed for *debulking of the right breast free*
(footnote continued)

3

at a surgery center owned/operated by non-moving defendant Northwell Health North Shore Hospital ("Northwell Hospital").[6] The anesthesia team of Dr. Galea and Nurse Booker (the "anesthesia team") elected for the patient to be operated under general anesthesia ("GA"). The anesthesia team exclusively managed and oversaw the patient's GA, including its induction in the patient and her emergence from it. The patient was obese with the body-mass index of 38.1[7] (obesity is associated with obstructive sleep apnea[8]) and also had a hiatal hernia.[9]

The patient's "Mallampati Score" or the level of difficulty of intubation – starting at Class "0" (meaning any part of the epiglottis was visible) being the easiest to intubate, and ending at Class "IV" (meaning that only the hard palate was visible) being the most difficult to intubate – was "Class III" (meaning that only the patient's soft palate and the base of her uvula were visible), thus indicating that she was in a more difficult class of intubation.[10]

The patient's medical history was significant for: (1) hypertension. and (2) a temporomandibular joint episode in connection with the upper endoscopy that she underwent approximately one year prior in February 2018.[11] The patient did not take her hypertensive

---

*flap and harvesting of autologous fat grafting from the abdomen, hips.* This was done into the Revolve closed collecting system where the *harvested fat* was rinsed . . . [,] while being manually centrifuged against the internal filter of the device. Then, *500 mL of purified fat graft material, was transferred to 20 mL syringes.* Then the *fat grafting cannula* was used first to pre[-]tunnel and elevate the skin island of the depressed portion of the left DIEP [deep inferior epigastric perforator] free flap. Then, *500 mL of autologous fat grafting was evenly distributed throughout the left breast reconstruction using a small-caliber blunt-tipped single-hole fat grafting cannula using low pressure manual injection technique with continuous motion. . ."* (emphasis added).

[6] North Shore University Hospital "Face Sheet" at NSUH-ASC 016.

[7] "Chart Copy Report" at NSUH-ASC 027.

[8] Dr. Galea's deposition transcript at page 62, lines 2-3 ("although [the patient] was not diagnosed with sleep apnea[,] she had some criteria for sleep apnea"). *See* Progress Note Adult-Plastic Surgery Attending, dated January 11, 2019 and timed at 18:43 hours ("Spoke with Dr. Galea who felt [the patient] had . . . OSA [obstructive sleep apnea]. . .").

[9] "Chart Copy Report" at NSUH-ASC 021.

[10] "Chart Copy Report" at NSUH-ASC 035.

[11] Pre-Anesthesia Evaluation at NSUH-ASC 006.

[* 3]

**4**

medication (Amlodipine) on the morning of surgery, and her blood pressure immediately before the induction of anesthesia was hypertensive (systolic) at 165/83.[12]

Pre-operatively, the anesthesia team assigned the patient ASA Grade 2,[13] meaning that, according to them, she had only a mild systemic disease which, in turn, made her a suitable candidate for the use of a laryngeal mask airway ("LMA")[14] to establish ventilation and maintain oxygenation, while she continued breathing on her own, in the course of the GA.[15] The anesthesia team elected to use a type of LMA known as "i-gel" which is equipped with a soft non-inflatable cuff (the "i-gel").[16] According to the manufacturer's user guide, the i-gel was contraindicated for patients (as was the instance here) "with . . . [the] Mallampati score of [Class] III and above" and, independently of the Mallampati score, for patients with a "hiat[al] hernia."[17] The patient's allergy to adhesives[18] presented a further difficulty to the anesthesia team in using the i-gel in her case because the manufacturer's user guide instructed that the i-gel be taped down from maxilla to maxilla after its insertion.[19] More fundamentally,

---

[12] Dr. Galea's Progress Note Adult-Anesthesia Attending, dated January 11, 2019 and timed at 20:06 hours at NSUH-ASC 039 ("Dr. Galea's Anesthesia Attending Note").

[13] Dr. Galea's Operative Anesthesia Grid at NSUH-ASC 005 ("Dr. Galea's Anesthesia Grid").

[14] Anesthesia Record at NSUH-ASC 005.

[15] Dr. Galea's July 20, 2023 deposition transcript at page 28, line 17 to page 29, line 3 ("[T]he patient did not need to be paralyzed. She needed to be under general anesthesia, but she did not require an endotracheal tube, she did not need to be paralyzed. . . . This patient was supposed to . . . breathe on her own for the entire [surgical] case.").

[16] Dr. Galea's Anesthesia Attending Note ("Patient underwent GA with LMA i[-]gel #5," which is its largest size). As an oropharyngeal supraglottic airway device, i-gel was approved by the FDA for use (among other uses) as a routine airway in anesthesia. *See* User Guide for I-gel Single Use Supraglottic Airway (01/2010) (the "user guide"), which is available at https://norcalems.org/wp-content/uploads/2022/01/6205A-User-Guide-i-gel-Supraglottic-Airway-Device-1.pdf (last accessed September 29, 2024). The manufacturer's official Web page for the use of i-gel in anesthesia is at https://www.intersurgical.com/info/igel-anaesthesia (last accessed September 20, 2024).

[17] User Guide, § 3.0 (Contraindications), Items 2 and 9, page 8.

[18] Pre-Anesthesia Evaluation at NSUH-ASC 006 (listing the patient's allergy to adhesives).

[19] User Guide, § 4 (Warnings), page 8 ("After insertion, i-gel should be taped down from maxilla-to-maxilla. . . ."); § 7.1 (Recommended Insertion Technique), page 14 ("i-gel should be taped down from 'maxilla to maxilla'").

5

the manufacturer's user guide instructed that *"[o]nce the patient is awake or easily arousable with vocal commands*, the i-gel can safely be removed by asking the patient to open his/her mouth wide, and replaced with an MC (medium concentration oxygen) mask."[20] In that regard, the manufacturer's user guide warned that "[s]ome of the known risks and complications of the use of supraglottic airway devices [such as an i-gel] include *laryngospasm*."[21]

After surgery was completed *but before the patient was awake and opened her eyes*,[22] one of the members of the anesthesia team removed the patient's i-gel.[23] The post-removal complications were summarized in Dr. Galea's Anesthesia Attending Note, as reproduced below (with explanations in brackets and with footnote references to deposition testimony and to medical record added for clarity):

> "[¶] [The i-gel] was removed [from the patient] at 16:15 [hours,] and at 16:19 [hours,] *[the first] short episode* (less than a minute) *of [oxygen] desaturation occurred*. The patient was given positive pressure [ventilation] with [oxygen] via [face] mask[,] and what could have been a short episode of laryngospasm [[24]] broke right away without pharmacological intervention. [Oxygen] saturation went [down] from 100% at 16:19 [hours] to 68% at 16:20 [hours] and back [up]

---

[20] User Guide, § 10.0 (Recovery Phase of Anesthesia and I-Gel Removal), page 15 (emphasis added).

[21] User Guide, § 13.0 (Adverse Outcomes), page 18 (emphasis added).

[22] The patient was not awake, nor was she able to follow commands when the i-gel was removed. According to the Ischemic Stroke Rescue note at NSUH-ASC 019, "MD [Dr. Galea] state[d] that *[the] [i-gel] was removed before she [the patient] was awake.* . . ." *See* Nurse Booker's deposition transcript at page 20, lines 21-23 ("[The patient's] level of consciousness, during the removal of the [i-gel], was in *deep sedation*."). *See also* Dr. Galea's July 20, 2023 deposition transcript at page 62, line 11 to page 63, line 21 (testifying that the *patient's eyes were closed* when the i-gel was removed) (emphasis added in each instance).

[23] It was unclear from the record whether either Dr. Galea or Nurse Booker (or both of them acting together) removed the i-gel from the patient. *See* Nurse Booker's deposition transcript at page 20, lines 15-18 ("*I don't recall specifically who removed the [i-gel]*. However, Dr. Galea instructed the removal of the [i-gel] and was present during the removal of the [i-gel].*"). *See also* Nurse Booker's deposition transcript at page 15, lines 18-23 ("[W]e [Dr. Galea and Nurse Booker] were both *not* in the [operating] room from the time the surgery commenced until the time the surgery ended. However, Dr. Galea was *present* during induction, emergence and frequently throughout the interim of the [patient's] case.") (emphasis added in each instance).

[24] At her deposition, Dr. Galea described the desaturation episode as a "laryngospasm." *See* Dr. Galea's April 15, 2022 deposition transcript at page 30, line 12. *See also* Nurse Booker's deposition transcript at page 29, lines 3-5 ("The laryngeal spasm presumably caused the [oxygen] saturation to decrease."). A laryngospasm, which is mediated by the vagus nerve, is defined as a "[r]eflex closure of the glottic aperture." Stedman's Medical Dictionary, Entry No. 480370 (online edition) (footnote by the Court).

[* 5]

**6**

to 100% at 16:21 [hours]. Vital signs: heart rate – mid 90's [beats per minute], blood pressure [hypertensive at] 170-150/100-82 [or, more precisely, 188/93 according to Dr. Galea's deposition testimony[25]].

[¶] Patient [was] unable to maintain adequate airway[,] and a nasal trumpet [*i.e.*, a nasopharyngeal airway was] placed. A few [milliliters] of hazy fluid was suctioned initially through the nasal airway.

[¶] The patient was placed on a face mask (non-rebreathing) [for positive-pressure ventilation,[26]] and *2 more subsequent episodes of [oxygen] desaturation within the high 87-88% followed.*[[27]] Vital signs: pupils constricted symmetrically bilaterally. Patient [was] responsive only to painful stimuli.

[¶] Decision [was] made to give a small dose of Narcan [an opioid-reversal agent[28]]. Narcan 0.04 [mg] and [another dose of] 0.04 mg [were] given. Pupils became dilated symmetrically, [but] patient still [was] not following commands.

[¶] [Operating surgeon] Dr. Feingold was informed[,] and transport to main Post-Anesthesia Care Unit and/or [Northwell Hospital's] Emergency Department was discussed . . . around [16:50 hours]. [Further discussion] with [anesthesiologist] Dr. [Paul] Epstein at [17:05 hours;] patient still [was] not following commands.

[¶] Decision [was] made to control the airway[,] and the patient was intubated [by way of rapid sequence induction by Dr. Galea] at [17:09 hours]. A[n] [arterial] line was placed [in the patient's left arm at 16:30 hours[29]].

---

[25] Dr. Galea's April 15, 2022 deposition transcript at page 52, line 12 (footnote by the Court).

[26] Nurse Booker's deposition transcript at page 23, lines 2-4 ("The [face] mask was applied[,] and positive pressure [ventilation] was given to break the laryngeal spasm.") (footnote by the Court).

[27] The timing of the two subsequent desaturation episodes could not be pinpointed in the record with any degree of accuracy. Dr. Galea conceded at her deposition that she did not chart the two subsequent desaturation episodes in her Anesthesia Grid, nor did she document the timing of those episodes elsewhere in the patient's chart, nor did she take a photograph of the anesthesia monitor reflecting the occurrence of those episodes. *See* Dr. Galea's July 2023 deposition transcript at page 65, line 15 to page 66, line 20. A photograph of the anesthesia monitor (taken by Dr. Galea with her cellular telephone but not included in the patient's chart), which recorded the events from 16:19 hours to 16:26 hours, reflected only the first episode when the patient desaturated to 68% at 16:20 hours (NYSCEF Doc No. 125). Two subsequent desaturation episodes likely occurred sometime between 16:26 hours and 16:50 hours (footnote by the Court).

[28] The patient received Fentanyl intraoperatively. Dr. Galea's April 15, 2022 deposition transcript at page 24, line 21 (footnote by the Court).

[29] Dr. Galea's April 15, 2022 EBT transcript at page 53, lines 6-10; Nurse Booker's deposition transcript at page 37, lines 18-19 (footnote by the Court).

7

[¶] [The] code stroke was called. The patient was hyperventilated to a[n] ETCO2 [end-tidal carbon dioxide] of 25[30] . . . Propofol drip [was] started [, and Labetalol was administered for hypertension31].

[¶] Discussed with Dr. Feingold [again]. Emergency Medical Services [were summoned at 17:42 hours32 and] arrived at [the surgery center at 18:10 hours]. The patient was transferred to [the] main Emergency Department [at Northwell Hospital]."33

At 20:15 hours on January 19, 2019, the patient was admitted to Northwell Hospital for "unresponsiveness." The patient's brain CT scans, performed on admission and throughout her hospitalization, progressed in terms of the severity of her brain injury. Whereas her initial CT Scan, performed in the evening of January 11, 2019, was unremarkable,34 her second CT scan, performed two days later on January 13, 2019, after one of her pupils had "blown" (meaning it had become extremely dilated and was not responsive to light), revealed that she had suffered an acute infarct and had other brain damage, as more fully set forth in the margin.35 The patient's treating pulmonologist nonparty Sameer Khanijo, M.D. ("Dr. Khanijo"), interpreted the results of her second CT scan in his progress note, dated January 17, 2019, as follows:

"Repeat [*i.e.*, the second] head CT [scan] shows multiple CVA [cardio-vascular accident] pattern[s] in posterior circulation. The question remains as to the mechanism for the catastrophic brain injury. *The pattern is highly suggestive of*

---

[30] According to Dr. Galea, "[a] normal range [of ETCO2] for an awake patient would be between 35 and 45." Dr. Galea's July 20, 2023 deposition transcript at page 33, lines 17-18 (footnote by the Court).

[31] Dr. Galea's April 15, 2022 deposition transcript at page 53, lines 10-12 (footnote by the Court).

[32] Prehospital Care Report Summary, dated January 11, 2019, at NSUH-ASC 017 (footnote by the Court).

[33] Dr. Galea's Anesthesia Attending Note (paragraphing and bracketed text added).

[34] CT Angio Brain Report, dated January 11, 2019, pages 2-3 of 3 ("No acute intracranial hemorrhage, mass effect, vasogenic edema or evidence of acute territorial infarct. . . . No flow-limiting stenosis or vascular aneurysm.").

[35] CT Brain Scan, dated January 13, 2019, page 1 of 2 ("Findings: Edema of the bilateral cerebellar hemispheres and brainstem resulting in basal cistern *effacement* and near complete effacement of the fourth ventricle. There is diffuse sulcal *effacement* involving the bilateral cerebellar hemispheres. Hypodensities involving the bilateral cerebellar hemispheres, pons, midbrain, bilateral thalami, and parietooccipital lobes compatible with *acute infarct*.") (emphasis added).

**8**

*embolic disease[,] rather than anoxic brain injury.* The patient had a very transient hypoxemic episode post-surgery with maintenance of blood pressure throughout and no consequential loss of airway. [S]o *hypoxemic or low flow injury [to] the brain may be discounted with a high level of probability.* The source of any emboli remains speculative. There is some thought of possible fat embolism with paradoxical embolism effect. . . . [The patient's family is] aware of the dismal clinical situation, and the uncertainty as to the etiology of the embolic CVA."[36]

The patient's third CT scan, performed on January 17, 2019 (or six days after surgery at issue), found "*[e]volving* posterior circulation *infarcts* with fourth ventricular compression and hydrocephalus. . . . Mild areas of hyperdensity within the thalami and temporo-occipital regions compatible with petechial hemorrhage [microbleeds]."[37] The patient's fourth and final CT scan, performed on February 18, 2019 (or four days before her discharge from Northwell Hospital), found "brainstem and bilateral . . . *infarcts* with associated hemorrhagic transformation in the bilateral occipital lobe region."[38]

On February 22, 2019 (or approximately one month after her admission), the patient was discharged to a nursing home. Her principal diagnosis on discharge was a "stroke."[39] Her secondary discharge diagnoses were: (1) bacteremia due to pseudomonas aeruginosa; (2) deep venous thrombosis of multiple veins;[40] (3) hypertension; (4) acute respiratory failure; (5) tracheitis; and (6) seizures.[41] At discharge, she was ventilator-dependent (tracheostomy, respiratory failure, and unable to wean), fed through a PEG tube (dysphagia and malnutrition),

---

[36] "Chart Copy Report," note, dated January 17, 2019 and timed at 16:04 hours, by Dr. Khanijo, page 246 of 1066 of Northwell Hospital's records (emphasis added). Dr. Khanijo further noted in his later note, dated January 19, 2019 and timed at 21:54 hours, that the patient's development of "new necrotic digits of the left hand rais[ed] concern for embolic phenomenon." *Id.*, page 317 of 1066.

[37] CT Brain Scan, dated January 17, 2019, page 2 of 2 (emphasis added).

[38] CT Brain Scan, dated February 18, 2019, page 1 of 2 (emphasis added).

[39] Northwell Hospital's Patient Discharge Instructions, page 1 of 7.

[40] "Duplex Scan Ext Veins Lower Bi," dated January 18, 2019, page 1 of 2; "Duplex Scan Ext Veins Lower Bi," dated February 4, 2019, page 1 of 2; "Duplex Ext Veins Upper Rt," dated February 16, 2019, page 1 of 2.

[41] Northwell Hospital's Patient Discharge Instructions, pages 1-2 of 7.

**9**

incontinent (both of bladder and bowel), and dependent on others for mobility and hygiene, exacerbated by the severe level of her confusion.[42] The patient's subsequent course of treatment is not relevant at this stage of litigation. The patient passed away approximately three years later on May 12, 2022 at the age of 45.[43]

After discovery was completed and a note of issue was filed, defendants moved for summary judgment, whereas plaintiff cross-moved for leave to serve his supplemental BOP. On May 17, 2024, the motion and cross-motion were fully submitted, and the Court reserved decision.

### Standard of Review

"The essential elements of medical malpractice are (1) a deviation or departure from accepted medical practice, and (2) evidence that such departure was a proximate cause of injury." *Fairchild v. Lerner*, 229 A.D.3d 506, 214 N.Y.S.3d 757 (2d Dept. 2024) (internal quotation marks omitted). "On a motion for summary judgment dismissing the complaint in a medical malpractice action, the defendant [medical provider] . . . has the initial burden of establishing the absence of any departure from good and accepted medical practice or that the plaintiff was not injured thereby." *Neumann v. Silverstein*, 227 A.D.3d 914, 209 N.Y.S.3d 584 (2d Dept. 2024) (internal quotation marks omitted). Where a defendant makes a prima facie showing, "the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact as to the elements on which the defendant met the prima facie burden." *Quinones v. Winthrop Univ. Hosp.*, ___ A.D.3d ___, 216 N.Y.S.3d 711 (2d Dept. 2024) (internal quotation marks omitted). "However, expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact." *Hannen v. Nici*, ___ A.D.3d ___, ___ N.Y.S.3d ___, 2024 N.Y. Slip Op. 04378 (2d Dept. 2024) (internal quotation marks omitted). "In order not to be considered speculative or conclusory, expert opinions in opposition should

---

[42] Northwell Hospital's Discharge Notice, page 2, dated February 22, 2019, and timed at 14:26 hours.

[43] Death Transcript, Certificate of Death No. 156-22-024625, dated May 21, 2022.

[* 9]

10

address specific assertions made by the movant's experts, setting forth an explanation of the reasoning and relying on specifically cited evidence in the record." *Rybek v. New York City Health & Hosps. Corp.*, 228 A.D.3d 968, 214 N.Y.S.3d 135 (2d Dept. 2024) (internal quotation marks omitted).

## Discussion

Defendants established their prima facie entitlement to judgment as a matter of law on the element of *proximate cause* by way of the opening affirmation, dated January 5, 2024,[44] of Dr. Roychowdhury, a board-certified diagnostic radiologist. With regard to the proximate cause element of plaintiff's medical malpractice and wrongful death claims, Dr. Roychowdhury opined that, based on his independent review of the radiological studies performed on the patient at Northwell Hospital, the patient "did not sustain an anoxic/hypoxic brain injury (hypoxic-ischemic encephalopathy) due to a lack of oxygen caused by mismanagement of her airway."[45] Rather, according to Dr. Roychowdhury, the patient's "brain injury and subsequent death were caused by a massive *basilar artery stroke (posterior circulation vascular infarction)*."[46]

Dr. Roychowdhury advanced four reasons for his opinion that the patient's brief, post-operative oxygen-desaturation episodes were not connected to the basilar artery stroke that she subsequently suffered. First, "[t]he CT pattern of [the patient's] brain injury [was] diagnostic of a *basilar artery* distribution stroke[,] not hypoxic ischemic injury."[47] Indeed, "[o]ne cannot have a[n] isolated *basilar artery* stroke from a lack of oxygen."[48] Second, "[t]he specific areas that were infarcted on the January 13, 2019 CT scan match[ed] exactly with the distribution of

---

[44] As noted, the Court disregarded Dr. Roychowdhury's supplemental affirmation which was annexed as the exhibit to defendants' reply affirmation.

[45] Dr. Roychowdhury's opening affirmation, ¶¶ 3 and 6.

[46] Dr. Roychowdhury's opening affirmation, ¶ 2 (emphasis added).

[47] Dr. Roychowdhury's opening affirmation, ¶ 7 (emphasis added).

[48] Dr. Roychowdhury's opening affirmation, ¶ 31 (emphasis added).

11

the *posterior circulation vessels* and [were] precisely where [Dr. Roychowdhury] would expect to see vascular infarction when a clot occlude[d] the *basilar artery* distribution."[49] Third and relatedly, "the temporal lobe, occipital lobe, cerebellar, brainstem, and thalami as seen on [the patient's] CT imaging between January 11 and February 18, 2019 . . . were hypodense and well-marginated, representing a classic *posterior circulation infarction* pattern."[50] Stated otherwise, the "ischemia developed only at the back of the [patient's] brain, [*i.e.,*] the areas supplied by the posterior circulation, while the rest of [her] brain was spared."[51] Fourth and finally, the "global hypoxic ischemic encephalopathy can be conclusively ruled out because there was no involvement of the basal ganglia, posterior limb of the internal capsule, or insula. *If the [patient] had sustained an injury due to lack of oxygen [as plaintiff alleged], the imaging would have demonstrated an injury pattern consistent with hypoxic ischemic encephalopathy, which was not present [in this case]."*[52] *See Quinones v. Winthrop Univ. Hosp.*, 216 N.Y.S.3d 711; *Gargano v. Langman*, 214 A.D.3d 770, 185 N.Y.S.3d 258 (2d Dept. 2023); *Schwartz v. Partridge*, 179 A.D.3d 963, 117 N.Y.S.3d 300 (2d Dept. 2020).

In opposition to defendants' prima facie showing, not one of plaintiff's three experts was able to raise a triable issue of fact on the element of *proximate cause*. Initially, plaintiff's anesthesiologist deferred on the element of proximate cause to plaintiff's pulmonologist's opinion that "the hypoxia in this case was a substantial cause in the hypercoagulability that caused the clots and stroke."[53]

Next, plaintiff's expert pulmonologist opined, in a conclusory fashion, that:

"[¶] [T]he generalized hypoxemia [was] a substantial factor in bringing about the blood clots and stroke and resulting brain damage and death.

---

[49] Dr. Roychowdhury's opening affirmation, ¶ 22 (emphasis added).

[50] Dr. Roychowdhury's opening affirmation, ¶ 32 (emphasis added).

[51] Dr. Roychowdhury's opening affirmation, ¶ 27 (emphasis added).

[52] Dr. Roychowdhury's opening affirmation, ¶ 33 (emphasis added).

[53] *See* Plaintiff's four-page Physician Affirmation (anesthesiology), dated March 20, 2024, pages 3-4.

12

[¶] Review of the records confirms that there was no other source of thrombi or emboli in the lower limbs or heart.

[¶] Therefore, there [was] direct causation between the perioperative hypoxia and the patient's stroke and brain damage."[54]

Lastly, plaintiff's neurologist opined as follows:

"Review of the scans and imaging evidence demonstrates *clots* in the *basal arteries* of the brain. Based on the time and length of the *hypoxic* event which preceded these clots, in my opinion, the patient was put into a *hypoxemic prothrombic environment* which resulted in the clots and brain damage which followed. The records reveal no other source for these clots[,] and they were not a coincidence or spontaneous stroke. There was no evidence of fat emboli or other thrombic source for the clots in the patient's brain circulation.

In my opinion, to a reasonable degree of medical certainty, these clots are a consequence of a *secondary hypercoagulability* which resulted from the *hypoxia* which occurred at the surgical center.

In my opinion, it is more likely than not, that the *hypoxia* caused the clotting which formed *in situ* as a result of the hypoxemia."[55]

Cutting through the thicket of the italicized terms, plaintiff's neurologist outlined in his/her opening affirmation the following cascade of events that allegedly led to plaintiff's basilar artery stroke. First, according to plaintiff's neurologist, the patient developed a "*hypoxemic prothrombic environment*" in the course of "a six-minute laryngospasm and hypoxic event following the surgery that was performed at the surgical center."[56] Next, the hypoxemic prothrombic environment (according to plaintiff's neurologist) progressed to a

---

[54] *See* Plaintiff's two-page Physician's Affirmation (pulmonology), dated March 20, 2024, page 2 (paragraphing added).

[55] *See* Plaintiff's two-page Physician's Affirmation (neurology), dated March 19, 2024 ("plaintiff's expert neurologist's opening affirmation"), pages 1-2 (emphasis added except for the phrase "in situ" which was italicized in the original). As noted, the Court disregarded plaintiff's expert neurologist's supplemental Physician's Affirmation, dated May 2, 2024, which was submitted in support of plaintiff's proposed (but rejected) sur-reply.

[56] Plaintiff's expert neurologist's opening affirmation, pages 1-2 (emphasis added).

13

"*secondary hypercoagulability.*"[57] Finally, the "secondary hypercoagulability" (likewise according to plaintiff's neurologist) caused "clots [to form] in [or to travel to] the *basal arteries* of the brain," thereby causing her to sustain a basilar artery stroke.[58]

Although both plaintiff's neurologist and defense expert Dr. Roychowdhury reached the same conclusion – that the patient suffered a basilar artery stroke – plaintiff's neurologist's chain of reasoning relied on two assumptions that lacked any reasonable ground underlying them. First, plaintiff's neurologist assumed the validity of plaintiff's anesthesiologist's unsupported pronouncement that "there was *a six-minute laryngospasm and hypoxic event following the surgery* that was performed at the surgical center."[59] Yet, the Court's detailed analysis of the record (as summarized above) found no "*six-minute* laryngospasm and hypoxic event." Second, plaintiff's neurologist ignored the patient's treating pulmonologist Dr. Khanijo's above-quoted opinion that a "hypoxemic or low flow injury [to] the brain may be discounted with a high level of probability." Curiously, however, plaintiff's counsel, while ignoring Dr. Khanijo's opinion, relied on the opinion to the same effect of the patient's other treating pulmonologist Paul Mayo, M.D., who likewise stated (in identical words) that a "hypoxemic or low flow injury [to] the brain may be discounted with a high level of probability."[60] Dr. Mayo's opinion (like Dr. Khanijo's opinion before him) refuted (rather than supported) plaintiff's neurologist's position that the patient had suffered a hypoxic ischemic injury at the surgery center.

Equally important, plaintiff's neurologist completely ignored Dr. Roychowdhury detailed reasoning and opinion that the patient had suffered "a massive basilar artery stroke (posterior circulation vascular infarction)" independent of (and unconnected to) her brief, post-operative oxygen-desaturation episodes.

---

[57] Plaintiff's expert neurologist's opening affirmation, page 1 (emphasis added).

[58] Plaintiff's expert neurologist's opening affirmation, page 1 (emphasis added).

[59] Plaintiff's expert neurologist's opening affirmation, page 1 (emphasis added).

[60] "Chart Copy Report," page 244 of 255, reflecting the note of pulmonologist and critical-care attending Paul Mayo, M.D., dated January 17, 2019 and timed at 18:17 hours.

14

In sum, plaintiff's neurologist's conclusory opening affirmation failed to establish a *causal connection* between the patient's brief, post-operative oxygen-desaturation episodes and the basilar artery stroke that she subsequently suffered. *See Javich v. Sullivan*, 192 A.D.3d 871, 144 N.Y.S.3d 719 (2d Dept. 2021); *see also Herrera v. Sanroman*, 187 A.D.3d 863, 130 N.Y.S.3d 383 (2d Dept. 2020); *Wagner v. Parker*, 172 A.D.3d 954, 100 N.Y.S.3d 280 (2d Dept. 2019).[61]

The dismissal of all claims against defendants (as more fully set forth in the decretal paragraphs below) rendered moot plaintiff's cross-motion for leave to serve his proposed supplemental BOP.

The Court considered the parties' remaining contentions and found them either moot or without merit in light of its determination. All relief not expressly granted is denied.

## Conclusion

Based on the foregoing, it is

**ORDERED** that the joint motion of defendants Cristina Galea, M.D. (incorrectly sued herein as Christina Galea), Paul Epstein, M.D. (incorrectly sued herein as Paul Epstein), Ava Booker, CRNA (incorrectly sued herein as Ava Booker), and North American Partners in Anesthesia, LLP, is granted in its entirety, and plaintiffs' claims as against each such defendant are dismissed with prejudice, and without costs or disbursements, and it is further

**ORDERED** that plaintiff's cross-motion for leave to serve his Supplemental Verified Bill of Particulars, dated March 20, 2024, is denied as moot, and it is further

---

[61] For the sake of completeness, the Court noted that the record as recited above and as supplemented by the relevant opinion of plaintiff's anesthesiologist on the element of *departure*, raised a triable issue of fact as to that element; namely, whether (among other things) the anesthesia team "prematurely remove[d] [the patient's] [i-gel] before [she] was fully awake." *See* Plaintiff's anesthesiologist's affirmation, page 2. Nevertheless, plaintiff's failure (as more fully set forth in the text above) to raise a triable issue of fact on the *proximate cause* element of his medical malpractice and wrongful death claims mandated their dismissal.

[* 14]

15

**ORDERED** that the complaint is now dismissed since the only remaining claim against the remaining defendant, Northwell Health North Shore Hospital, was vicarious liability.

This constitutes the Amended Decision, Order, and Judgment of the Court.

ENTER,

Genine D. Edwards
J. S. C.

[* 15]